# Francis P. Klemmer *v.* Mount Penn Gravity R. R. Co., Appellant.

*Jury — Jury list — Custody — Filling wheel — Practice, C. P. — Acts of April* 10, 1867, *and March* 18, 1874—*Review—Divided court—Facts.*

The Supreme Court will not reverse a judgment on a verdict on the ground that the jury list, as provided by the acts of April 10, 1867, P. L. 62, and March 18, 1874, P. L. 46, although deposited with the prothonotary, was not marked filed of record, and was withdrawn from his office and kept in the sheriff's office, where it appears that the list was not concealed or in any way tampered with.

The jury commissioners and the judge, in alternately selecting names from the whole qualified electors of the county, may use lists made up by themselves of persons whom they deem sober, intelligent and judicious, although the information upon which their judgment is based is obtained from others.

On an appeal from a judgment of the court of common pleas of a county where there were two judges, it appeared from the record that one of the judges stated that the jury lists were made up by political and personal favor from the selection of others.   The other judge stated that the list of jurors was made out by an honest selection in the interest of no one.   A motion to quash the array was overruled.   Subsequently other evidence was taken bearing upon the manner in which the jurors were selected. *Held,* (1) that the Supreme Court could only consider the evidence of record at the time the motion to quash was overruled; (2) that the Supreme Court could not supply the facts from the contradictory statements of the two judges; (3) that as there was not sufficient evidence properly before the court to show irregularity in the selection of jurors the judgment could not be reversed.

*Jury commissioners—Judge—Oath—Act of April* 10, 1867—*Motion to quash array—Laches.*

On an appeal from a judgment on a verdict, it appeared that the jury

commissioners and sheriff had taken the oath prescribed for county officers by the constitution of 1874, to discharge the duties of their office with fidelity. Prior to the selection of the jury list they took an oath that they would "faithfully fill the jury wheel, in performance of our duties of our office, pursuant to the provisions of the act of assembly of April 10, 1867." They did not take the form of oath prescribed by the act of April 14, 1834, § 87, P. L. 357. Counsel for defendant knew of the irregularity, at a time when he obtained a continuance of the case. Four months after the date of the continuance he moved the court to quash the array, which motion was overruled. *Held*, that the defendant had not observed due diligence, and that the judgment should not be reversed.

A motion to quash the array should be made as soon as the facts which warrant it are known.

The judge is not required to take an additional oath before entering upon the duty of selecting jurors.

*Custody of jury wheel.*

It is no ground for quashing the array of jurors because the jury wheel, after having been properly filled, locked and sealed, was kept by one of the commissioners, with the consent of the other, at his home some miles from the county seat.

Argued March 1, 1894. Appeal, No. 113, Jan. T., 1894, by defendant, from judgment of C. P. Berks Co., Feb. T., 1892, No. 56, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and DEAN, JJ. Affirmed.

Trespass for personal injuries.

From the record it appeared that suit was brought on Feb. 5, 1892. On Dec. 5, 1892, defendant pleaded not guilty. The case was then put on the trial list, and on Jan. 7, 1893, was continued on application of defendant. On May 1, 1893, defendant challenged the array of jurors, and renewed the challenge Oct. 16, 1893, specifying the following reasons : (1) The jury list was not filed in the prothonotary office until Aug. 3, 1893, contrary to the act of March 18, 1874, § 3. (2) The oath of the jury commissioners was not filed until Aug. 2, 1893, contrary to the act of 1874, § 4. (3) The form of oath was not according to § 87 of the act of April 14, 1834, and § 3 of the act of April 10, 1867. (4) The judge took no oath as required by §§ 2 and 3, act of April 10, 1867. (5) The judge's oath was not filed, as required by § 4 of the act of March 18, 1874. (6) The jury wheel was kept at the private residence of a jury commissioner contrary to act of April 10, 1867, § 2. (7) The

jury commissioners had a prepared list of names, contrary to § 2 of the act of April 10, 1867.

The motion to quash the array of jurors was overruled by an equally divided. court. The case went on to trial, and resulted in a verdict and judgment for plaintiff for $4,000. Defendant appealed.

*Error assigned* was in overruling the motion to quash th array of jurors, quoting .motion and reasons.

*Henry A. Muhlenberg* and *Jefferson Snyder, Geo. F. Baer* with them, for appellant.—The jury list was not· kept in the prothonotary's office as required by law : Munshower v. Patton, 10 S. & R. 336 ; Acts of April 14, 1834, § 127, P. L. 357 ; April 10, 1867, P. L. 62 ; March 18, 1874, §§ 1–4, P. L. 46 ; Showers v. Com., 120 Pa. 573 ; Clark v. Com., 29 Pa. 129 ; Com. v. Baranowski, 5 Pa. C. C. R. 643.

The oath taken by the jury commissioners did not conform .to the act of April 14, 1834, § 87 ; Acts of April 10, 1867, § 3, P. L. 62 ; May 8, 1874, § 1, P. L. 122. The president judge should also have taken the oath or affirmation : Act of April 10, 1867, §§ 2, 3.

The custody of the jury wheel was illegal : Act of April 10, 1867, § 2, P. L. 62 ; Rolland v. Com., 82 Pa. 306.,

The selection of the names for the ·jury list was irregular : Act of April 10, 1867, § 2, P. L. 62.

See, on above points, Munshower v. Patton, 10 S. & R. 334 ; Brown v. Com., 73 Pa. 329 ; Curley v. Com., 84 Pa. 155 ; Campbell v. Com., 84 Pa. 187 ; Foust v. Com., 33 Pa. 338 ; Lynch v. Com., 77 Pa. 205 ; Rolland v. Com., 82 Pa. 306 ; Showers v. Com., 120 Pa. 573 ; Clark v. Com., 29 Pa. 129 ; Com. v. Baranowski, 5 Pa. C. C. R. 643 ; Kell v. Brillinger, 84 Pa. 276 ; Ins. Co. v. Adams, 110 Pa. 553.

The general rule is that a power intrusted to any public body, composed of several, can be lawfully exercised only when that body is duly convened and acting as such, and not by its individual members acting separately: Pike Co. v. Rowland, 94 Pa. 238. No doubt one purpose of the statute in requiring the selection to be made alternately by members of the board, met as such, and therefore, in each other's presence, was to

remove at least the appearance, and prima facie the possibility
of outside influence in the selection of the jurors: Kell v. Bril-
linger, 84 Pa. 276; Com. v. Baranowski, 5 Pa. C. C. 642.

*M. H. Schaffer, A. B. Rieser* with him, for appellee.—The
motion should be made with all diligence.  The objection
should be presented as soon as known: 2 Brewster's Pr. 1216.

There was a trial upon the merits, on the plea of the general
issue, thereby waiving all alleged errors, defects and irregu-
larities, if any existed: Rolland v. Com., 82 Pa. 306; Act of
Feb. 21, 1814, 6 Sm. Laws, 111; Br. Purd. 968, pl. 88; Dyott
v. Com., 5 Whart. 67.

Counsel for appellant cite a number of authorities which are
inapplicable to this case, the facts in all of them being entirely
different.

In Kell v. Brillinger, 84 Pa. 276, it was held that the array
should have been quashed because the judge and jury commis-
sioners took 350 names out of the wheel and redeposited 300 of
the same names for the remainder of the year.  Of course this
was no new selection.

In Brown v. Com., 73 Pa. 321, which was a criminal case,
charging the defendant with murder (where the courts are
more exacting than in civil cases), the jury wheel was con-
demned because it was sealed with but one seal.  In the pres-
ent case, however, the sheriff had the key and the wheel was
carefully sealed by three separate seals.

In the case of Showers v. Com., 120 Pa. 573, there was but
one ground of challenge.  It was held that, upon a venire
for forty-eight petit jurors for a court of oyer and terminer,
there were drawn and returned forty-eight names, but among
them the names of two persons who, at the time of the draw-
ing, were deceased, and the name of one person who had then
removed from the county—the evidence showing the fairness
and good faith of the officers—is no ground for quashing the
array on motion of defendant.

The case of Ins. Co. v. Adams, 110 Pa. 553, so greatly relied
upon, does not help defendants.  There counsel moved to
quash the array for five distinct reasons, among them, the
form of the oath, and that the key of the jury wheel was never
in the custody or possession of the sheriff, and that the sheriff

was not sworn. The only reason discussed by the Supreme Court was the improper custody of the key.

In Campbell v. Com., 84 Pa. 187, it is alleged that the jury commissioners were not sworn at the time they selected the names of the jurors. The court found substantially that the actual selection was the final passing upon the names, when they put them into the wheel, even though they had commenced to select names before oath taken. This case is in our favor.

Curley v. Com., 84 Pa. 151, supports our view as to the custody of the jury wheel.

Com. v. Baranowski, 5 Pa. C. C. R. 642, is relied upon on the question of selection alternately, but a reference to it will show that the first undisputed reason was that the sheriff neither produced the key of the wheel when it was opened, nor locked it when the drawing was completed, nor placed his seal upon it.

OPINION BY MR. JUSTICE DEAN, Oct. 1, 1894:

Francis P. Klemmer, the plaintiff, on the 5th of November, 1891, while a passenger on the Mount Penn Gravity Railroad, near Reading, was very seriously and probably permanently injured. The train, consisting of two cars, was running down the incline by gravity, when, from some cause, the brakeman lost control of the brakes; the consequence was the cars jumped the track and were wrecked. Klemmer, averring negligence on part of the company, brought suit for damages; the issue was tried before Judge ENDLICH, who, in a brief but very clear and impartial charge, submitted the evidence, bearing on the questions of negligence and the measure of damages, to the jury. There was a verdict for plaintiff in the sum of $4,000. Although defendant submitted four written prayers to the court for instructions, three of which were denied, no exceptions were taken to the charge, and there is no assignment of error to any of the rulings of the court after the jury was sworn. Before the jury was sworn, however, defendant's counsel challenged the array of jurors, and moved to quash the same, because of alleged gross irregularities in filling the wheel under the act of 1867 and its supplements.

The motion to quash failed, because of an equally divided

court; divided in opinion on some questions of law, but irreconcilably on some of the most material facts to which the law applied. And to make the questions of fact impossible of decision here, the two most important of them rest on the personal knowledge of the two judges, as set forth in their respective antagonistic opinions. After the motion was overruled, Judge ENDLICH, first, filed an opinion giving his reasons why the motion ought to have prevailed, and in this he states, as within his knowledge, facts on which his opinion is largely based. Then Judge ERMENTROUT filed an opinion, overruling the motion to quash, in which he makes a statement of facts within his knowledge, in direct conflict with those stated by Judge ENDLICH. Then Judge ENDLICH filed another opinion in reply, and Judge ERMENTROUT another brief one in reply to this.

These opinions, in some of their features, would hardly be called judicial, for both contain, at least, imputations of unseemly conduct by each against the other in the performance of judicial functions. Harmony between members of the same court and cordial co-operation in a dignified judicial administration of justice, are highly desirable, but the personal bearing of members of a court toward each other, is not a question which concerns us in a judicial review of their judgments; that is a matter which more nearly concerns the bar, and the people of their own district; unless, indeed, as to some extent in this case, personal asperity in the court below has so beclouded fact, as to render judgment impossible or doubtful.

Our conclusions as to the law applicable to the facts, would present no serious difficulty, if the learned judges concurred as to the facts; but they radically differ. For example, the first reason in the motion to quash, is, that under the act of 1874, a supplement to the act of 1867, no list containing the name, occupation and residence of each juror, etc., was filed in the office of the prothonotary. Judge ENDLICH states no such list was filed as required by law. Judge ERMENTROUT states, this list, substantially, in all particulars, as required by the act, was made out and certified, and although not formally marked filed by the prothonotary, before the motion to quash, it had been deposited in and the seal of the court affixed in the prothonotary's office; was used by the sheriff and the court as a document of the court, and as the list intended by the act for the prothonotary's office.

This list ought to be formally filed in the office of the pro-thonotary, and ought to remain there, but if made out according to the requirements of the act, and put in possession of the prothonotary, although afterwards taken to the sheriff's office, and for most of the time kept there, this is not such a gross irregularity as called for quashing the array; especially if the court and all parties interested had access to it. If no list as required was made out at all, it would be sufficient ground to quash. Judge ENDLICH states, this list referred to by Judge ERMENTROUT, was nothing but the sheriff's book of names, which the act of 1834 required him to keep, and in no sense the list of names placed in the wheel, which the judge and jury commissioners were required to certify under the supplement to the act of 1867. Judge ERMENTROUT states, as within his knowledge, it was made out and certified by himself and the jury commissioners; the seal of the court attached in the prothonotary's office, and repeatedly laid before the court, when required in conducting the business of the court. What purports to be a copy of this list, with heading and certificates, and 22 names of the 1200 put in the wheel for 1893, is printed in appellee's paper-book. If such list as this was made out and deposited in the prothonotary's office, that was a substantial compliance with the requirements of section 3 of act of 1874. And although it ought to have been marked filed of record, and ought to have been kept at all times thereafter as one of the records of the prothonotary's office, still, as there is no intimation that it was ever tampered with or concealed, the irregularity is not of that gravity, as at this stage of the trial warrants this court in sustaining the motion to quash.

Again, the seventh reason on which the motion is grounded, is, that the jury commissioners and president judge did not select alternately from the whole qualified electors of the county, such number of sober, intelligent and judicious persons for the year as the court at the preceding term had designated.

We decidedly concur with Judge ENDLICH that this is by far the gravest of all the objections urged in the motion to quash. The primary object of the act of 1867 in taking from the sheriff and county commissioners the duty of filling the jury wheel, and providing for the election of jury commissioners, who, with the President or Additional Law Judge, should

perform that duty, was to guard against unjust political prejudice in the selection of jurors.  Before the adoption of the constitution of 1873, the board of county commissioners and sheriff in any one county, generally, all belonged to the same political party; complaints were made by the minority party, in many of · the counties, of political partiality in filling the wheel.  The legislature, on the assumption that this evil existed, created the office of jury commissioner, and provided for representation of the minority; and further, prescribed a method of filling the wheel, which was intended to remedy the evil complained of under the act of 1834.  The importance of this office to the people of the commonwealth can scarcely be exaggerated; nor can there be, any difference of opinion as to the absolute necessity of requiring strict fidelity to duty in those who hold it.

As to the manner in which the commissioners and President Judge performed this duty, Judge ENDLICH says: " When the board met, each member had a list prepared in advance, partly from his own knowledge, but largely from suggestions received from others.  Some of these suggestions were voluntarily offered by friends or acquaintances, persons who desired to do jury service, or whose friends desired to do so.  Many of them, however, were procured by a system of inviting persons of acknowledged prominence, politically or otherwise, in the various wards, boroughs and townships of the county, to hand in the names of a certain number of persons living in their districts for the purpose of filling the jury wheel.  From the names thus handed in, the lists referred to were largely compiled.  From these lists, the several members of the board alternated in calling off the names, which were placed in the wheel.  The list of the ' whole qualified electors ' of the county, though readily obtainable, was never before the board or before any member of it."

As to the facts, thus stated, of such controlling importance in the disposition of this motion, notice the statement of Judge ERMENTROUT in his opinion: " Where, I ask, are any such facts of record in this case?  They could not have been admitted last May or June, because the reason was not filed until October 16, 1893.  These facts are neither admitted nor proven, nor capable of being proven.  At no time did the jury commis-

sioners have a prepared list from which all the jurors were selected. Each jury commissioner for himself, without dictation or suggestion from his fellow commissioner or the President Judge, invariably made his own selection; no jurors were selected concurrently. Each of the three, acting independently of the other, made his own selection of each individual juror alternately, that is, one after another. None knew or permitted each other to know of the selection each one made, until publicly announced and placed in the jury wheel. All were thus honestly selected in the interest of no one; in the interest of neither clique nor faction, political or social, but with the sole desire to place in the jury wheel sober, honest, intelligent jurors, who, in a community composed largely of German-speaking people and other mixed nationalities, could understand the English language."

The duty of the jury commissioners and President Judge was to "select alternately from the whole qualified electors of the county" the names of 1200 "sober, intelligent and judicious persons," and place these names in the jury wheel. At the last Presidential election, very nearly 29,000 qualified electors voted in Berks county. It is not improbable there are in the county 30,000. As 1200 names were ordered to be put in the wheel, about one man was wanted out of every twenty-five, for jury service. Any one will readily understand, the duty of the board, in such a populous county, was no light one. To eliminate the aged, decrepit, ignorant, intemperate, and those who did not understand the English language, and then select from the large number of competent persons remaining, 1200, could only be done by careful inquiry, thought and preparation beforehand. There is not probably, in the county, a single person qualified from his own knowledge to do this. His ability to select, must, in large degree, come from information derived from others. That the members of the board made private lists, prepared by themselves beforehand, of "sober, intelligent and judicious persons," proves nothing more than that they sought, by inquiry, to qualify themselves for a proper performance of their duty. If they had taken up the lists of the voters in the different districts, and at once made selections from nearly 30,000 names thereon, unless they were men thoroughly acquainted with the voters of every pre-

cinct, and of phenomenal memory, they would have been wholly incapable of performing the duty as the law enjoined. If they filled the wheel from lists prepared by others, no matter by whom, it was a gross violation of duty. But if they made up lists of sober, intelligent and judicious persons themselves, on their own judgment, although on information obtained from others, this was the only way, in very many cases, that they could intelligently perform their duty. The act does not require that they shall take up the list of the whole qualified electors, and alternately select therefrom, but that the selection shall be made "from the whole qualified electors." That is, the selection shall not be made from a part, such as one political party, the members of one church or one faction, but from the whole, without distinction of party, creed, race, social or family relation.

The fact as stated by Judge ENDLICH is, that the lists were made up by political and personal favor, from the selection of others ; as stated by Judge ERMENTROUT, they were selections honestly made on the judgment of the commissioners.

We take the record before us, as it stood October 16, 1893, when the motion to quash was overruled, and the facts as gathered from the opinions of the judges filed on the motion to quash.

After the final decree, and after the writ out of this court was served, further evidence was taken. But we must review judgments in the light of the evidence on which they are founded, and not on evidence adduced afterwards. The time to try a cause is when it is at issue, and for trial, and not after the issue has been closed by final decree or judgment.

If the fact were clear that this jury wheel had been filled by selections made by political and personal friends of the board, we would not hesitate a minute in sustaining the motion to quash, and in reversing the judgment. We would do this, even though as to irregularities of less gravity appellant might be treated as having waived them. One of this character, no consent or waiver of parties could cure ; it effectually undermines the foundation of the administration of justice.

That sworn officers, intrusted with the performance of the highest duty, one on which hinge the life, liberty and property of the citizen, should, to any extent, surrender their functions to personal and political friends, as stated by Judge ENDLICH,

could not be tolerated for a moment in any court, even though the parties affected by it were willing to condone the wrong. But here we are met by a flat contradiction as to the fact, with no other means of determining it, than by passing on the truthfulness of two judges, with nothing but their antagonistic attitude on this record to affect the credibility of either; and their imputations are not unevenly balanced. As the appellant did not see proper to take testimony prior to his motion to quash, to sustain it, or to have placed on record any agreement as to the facts, it is not our duty to supply the facts from contradictory statements of members of the court who passed on the motion, and we can only treat the first and seventh reasons as based on facts alleged, denied and not proven.

The second reason, which alleges that the oath was not reduced to writing and filed as required by law, in substance raises the same question referred to in the first. The oath was attached to and formed part of the same book or paper containing the list of names placed in the wheel, so this reason requires no further notice.

The third alleges the form of the oath was not that required by the statute. The oath taken was as follows :

"We, J. A. Spangler and David Brown, jury commissioners in and for the said county of Berks, do severally swear that we will faithfully fill the jury wheel, in performance of our duties of our office, pursuant to the provisions of the act of assembly of the tenth day of April, 1867, entitled an act for the better and more impartial selection of persons to serve as jurors in each of the counties of the commonwealth."

The oath prescribed by the act of 1867, is the one enjoined by section 87 of the act of 1834, to be taken by the sheriff and county commissioners. The form of that oath, as given in the act, is :

"You and each of you do swear that you will use your utmost endeavors and diligence in making an impartial selection of competent persons for jurors during the ensuing year, and that you will not suffer partiality, favor, affection, hatred, malice or ill will in any case or respect whatever, to influence you in the selecting, drawing or returning of jurors; but that you will in all respects honestly conform to the true intent and meaning of the acts of assembly in such case made and provided."

It is clear, as held by Judge ENDLICH, that this is the oath the jury commissioners should take before proceeding to fill the wheel, and the one, with some modification, the sheriff should take before drawing from the wheel. This was, in effect, decided in Campbell v. Commonwealth, 84 Pa. 187. That the words "make an impartial selection of competent persons," cannot, under the duty imposed on the sheriff by the act of 1867, apply to him, as now, he has nothing to do with the selection, is not important. In the oath taken by him, that part having no reference to his duties can be eliminated.

Both the jury commissioners and sheriff, when they entered upon the duties of their respective offices, had taken the oath prescribed for county officers by the constitution of 1874, that is, to discharge the duties of their offices with fidelity. Then each took an oath to faithfully fill the jury wheel in performance of the duties of their office pursuant to the provisions of the act of 1867. As the act of 1867 referred to the act of 1834, and as the duties of the commissioners, as specified in that act, were in the form of an oath, it might fairly be implied, the commissioners were sworn to perform these duties, and so understood it. And while the oath written out and filed should have been that prescribed in the act of 1834, so modified in the case of the sheriff as to cover his duties under the act of 1867, the irregularity is not of that character, in view of all that occurred at this trial, as warrants us in holding it fatal.

We do not desire to be understood, however, as in the remotest degree approving the omission to take and subscribe the oath enjoined by the act of 1867, the form of which is given in the act of 1834. While such an irregularity as is set out in the seventh, is sufficient reason for quashing at any time, whenever the fact of it is established to the satisfaction of the court, that set out in the third reason, while serious enough to move the court to quash when the objection is promptly urged, is not of that character which would warrant this court in reversing a judgment, if it were not made promptly when the party was informed of it.

The appellant's counsel knew of this irregularity January 7, 1893, but without objecting to it then, made a successful application for a continuance ; then, on the 1st of May following, nearly four months afterwards, filed his motion to quash, mak-

ing this one of the reasons. This was not diligence. All text writers on practice say that a motion to quash the array should be made as soon as the facts which warrant it are known.

The fourth objection, that the President Judge did not take and subscribe an oath in writing, is wholly destitute of merit. He is not required by any statute to take an additional oath before entering on this duty.

The sixth, relating to the custody of the jury wheel, is without weight. After being filled, locked and sealed in every particular as the law directs, one of the commissioners, who lived some miles from the county seat, by an express agreement between them, took the wheel with him and kept it at his home. There is no intimation that it was tampered with; the possibility of tampering with it, under the circumstances, is all that is suggested. The act directs, that " the jury wheel shall remain in the custody of the jury commissioners," the keys to be kept by the sheriff. An expression of this Court in Rolland v. Commonwealth, 82 Pa. 306, is wrested from its connection in the opinion, and urged as a declaration that such disposition of the wheel was illegal. In that case, the wheel had been left in a chest of a vault in the county commissioner's office, of which the clerk had the key. It was argued that this was not the custody the law required. Justice PAXSON, in his opinion, says : " We must give this section a reasonable interpretation. It does not designate where the wheel shall be kept, and provides no place where the jury commissioners shall deposit it. It was not intended that they should carry it to their private residences—in many instances they reside several miles from the county seat. Its removal from the seat of justice would be as inconvenient as unnecessary." The meaning here, in connection with the facts of the case, is so manifest, that it ought not to require notice. The appellant in that case argued that the words " the wheel shall remain in the custody of the said jury commissioners," meant the physical control and possession of the wheel by the commissioners. This Court, in answer, said, no, the law did not require an unreasonable thing; did not impose an unnecessary and inconvenient burden upon the officers ; it was in their custody, if in one of the public offices of which their clerk had the key. If that wheel had been in the residence of one of the commissioners, by agreement of the

other, as here, the counsel in that case would have raised no questions as to its legal custody. Here, the law imposed no such inconvenience and burden on the jury commissioner as he chose to assume in the custody of the wheel; he went further, in a literal compliance with the law, than a reasonable interpretation of it exacted. He subjected himself to this inconvenience, because the county commissioners had not, as it was their duty to do, provided a place in the public buildings where it could be kept, constructively, in the custody of the jury commissioners.

There is nothing further calling for notice in this record; it is exceptional, in its most prominent fact, which is, that two occupants of high judicial station, for whose learning, ability and integrity this Court has the greatest respect, appear to have the opposite opinion of each other, and deliberately make their opinions a part of the records of the court.

The judgment is affirmed, and the appeal is dismissed at the costs of appellant.